BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com

*Attorneys for Plaintiff*

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLOTTE BARK, Derivatively on Behalf of EDISON INTERNATIONAL, <br><br> Plaintiff, <br><br> v. <br><br> PEDRO J. PIZARRO, MARIA RIGATTI, JEANNE M. BELIVDEAU-DUNN, MICHAEL C. CAMUNEZ, VANESSA C. L. CHANG, JAMES T. MORRIS, TIMOTHY T. O'TOOLE, MARCY L. REED, CAREY A. SMITH, LINDA G. STUNTZ, PETER J. TAYLOR, and KEITH TRENT, <br><br> Defendants, <br><br> and <br><br> EDISON INTERNATIONAL, <br><br> Nominal Defendant. | Case No: _____ <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff, by and through her undersigned counsel, derivatively on behalf of Edison International ("Edison" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon her personal knowledge as to herself and her own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' violations of state and federal law that have caused substantial harm to the Company.

2.     On January 7, 2025, a fire began in the area of Eaton Canyon (the "Eaton Canyon Fire") in the unincorporated census designated place in Los Angeles County, California, called Altadena, within a half mile from the intersection of North Altadena Drive and Midwick Drive in Pasadena, CA 91107 ("General Area of Origin").

3.     The transmission circuit in Eaton Canyon, as well as related hardware fixtures, devices, structures, components, property, easements, and rights of way were part of an electrical transmission system ("ETS") owned, designed, constructed, installed, inspected, maintained and/or controlled by Defendant Edison or its subsidiary SCE.

4.     Following the outbreak of the Eaton Canyon Fire, on January 8, 2025, Edison stated in a press release that its "distribution lines immediately to the west of Eaton Canyon were de-energized well before the reported start time of the fire, as part

- 1 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

of SCE's Public Safety Power Shutoff (PSPS) program."

5.     However, on January 12, 2025, Edison admitted that there were "no interruptions or operational/electrical anomalies in the 12 hours prior to the fire's reported start time until more than one hour after the reported start time of the fire."

6.     On January 13, 2025, a complaint was filed in the Superior Court of the State of California for the County of Los Angeles alleging that the fires originated from Edison's power lines. The complaint included eye-witness accounts and photographs that showed the fire was started by Edison's electrical equipment.

7.     On February 6, 2025, The Wall Street Journal reported that SCE "submitted two letters to the California Public Utilities Commission with updates on its analysis of the Eaton and Hurst wildfires, saying it believes its equipment may be associated with the start of the Hurst fire."

## JURISDICTION

8.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

9.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) one or more of the defendants either resides in or maintains executive offices in

- 2 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District; and (iv) defendants have otherwise purposefully availed themselves of this District through issuing false statements in this District.

11.    In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiff

12.    ***Plaintiff*** is, and was at relevant times, a shareholder of the Company. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

13.    ***Nominal Defendant Edison*** is incorporated in the state of California, and the Company's principal executive offices are located at 2244 Walnut Grove Ave., P.O. Box 976, Rosemead, CA, 91770. Edison securities trade on the New York Stock Exchange ("NYSE") under the symbol "EIX."

### Director Defendants

14.    ***Defendant Pedro J. Pizarro*** ("Pizarro") was the Company's Chief Executive Officer ("CEO") and a director of the Company at all relevant times.

15.    ***Defendant Jeanne M. Beliveau-Dunn*** ("Beliveau-Dunn") has served as

- 3 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

a director of the Company since 2019. She also serves as a member of the Nominating and Governance Committee and the Safety and Operations Committee.

16.    **Defendant Michael C. Camunez** ("Camunez") has served as a director of the Company since 2017. He also serves as a member of the Audit and Finance Committee and the Nominating and Governance Committee.

17.    **Defendant Vanessa C. L. Change** ("Chang") has served as a director of the Company since 2007. She also serves as the chair of the Compensation and Executive Personnel Committee and as a member of the Nominating and Governance Committee.

18.    **Defendant James T. Morris** ("Morris") has served as a director of the Company since 2016. He also serves as the chair of the Audit and Finance Committee and as a member of the Compensation and Executive Personnel Committee and the Pricing Committee.

19.    **Defendant Timothy T. O'Toole** ("O'Toole") has served as a director of the Company since 2017. He also serves as the chair of the Safety and Operations Committee and as a member of the Audit and Finance Committee.

20.    **Defendant Marcy L. Reed** ("Reed") has served as a director of the Company since 2022. She also serves as a member of the Audit and Finance Committee and the Safety and Operations Committee.

21.    **Defendant Carey A. Smith** ("Smith") has served as a director of the Company since 2019. She also serves as a member of the Compensation and Executive Personnel Committee and the Safety and Operations Committee.

22.    **Defendant Linda G. Stuntz** ("Stuntz") has served as a director of the Company since 2014. She also serves as the chair of the Nominating and Governance Committee and as a member of the Compensation and Executive Personnel Committee.

- 4 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

23.    **_Defendant Peter J. Taylor_** ("Taylor") has served as a director of the Company since 2022. He also serves as a member of the Compensation and Executive Personnel Committee and the Nominating and Governance Committee.

24.    **_Defendant Keith Trent_** ("Trent") has served as a director of the Company since 2018. He also serves as a member of the Audit and Finance Committee and the Safety and Operations Committee.

25.    The above-named defendants are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

26.    **_Defendant Maria Rigatti_** ("Rigatti") was the Company's Chief Financial Officer ("CFO") at all relevant times.

27.    Defendant Rigatti along with Defendant Pizarro are collectively referred to herein as the "Officer Defendants."

28.    The Director Defendants and Officer Defendants are collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background**

29.    Edison International is the parent holding company of Southern California Edison Company ("SCE") and Edison Energy Group, Inc. ("Edison Energy Group"). SCE is an investor-owned public utility primarily engaged in the business of supplying and delivering electricity to an approximately 50,000 square mile area of southern California. Edison Energy Group is a holding company for Edison Energy, LLC which is engaged in the competitive business of providing energy services to commercial and industrial customers.

30.    Southern California is an area that has suffered due to climate change, dry weather, and high winds, making the area as a whole prone to wildfires. As such,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

one of the largest risks posed to the Company is extreme weather events (such as high wind), which can cause and quickly spread wildfires throughout the region.

31.    Electrical equipment has historically posed a great wildfire risk to California. Since 1992, over 3,600 wildfires in California have been tied to power lines and electrical equipment. Electrical equipment has been the cause of 479 wildfires in California in 2023 alone.

32.    Pursuant to Public Utilities Code section 451, "[e]very public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities … as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public."

33.    To meet this safety mandate, utilities are required to comply with California Public Utilities Commission ("CPUC") General Order 95's rules for overhead electric line construction.  In extreme fire areas, utilities are required to ensure their power lines and utility poles can withstand winds of up to ninety-two miles per hour.  SCE's safety obligations apply equally to the Mesa-Sylmar transmission line connected to SCE's Transmission Tower M16T1 (a transmission tower located in Eaton Canyon) even though the line is no longer in service.  CPUC General Order 95, Section III, Rule 31.2 specifically provides that "[l]ines temporarily out of service shall be inspected and maintained in such condition as not to create a hazard."

34.    Pursuant to Public Resources Code section 4292, the Company must "maintain around and adjacent to any pole or tower which supports a switch, fuse, transformer, lightning arrester, line junction, or dead end or corner pole, a firebreak which consists of a clearing of not less than 10 feet in each direction from the outer circumference of such pole or tower."  SCE's transmission towers in the Eaton Canyon Fire's general area of origin2 are each, and all of them, owned, controlled,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

operated, or maintained by SCE in mountainous and brush covered land within the meaning of Public Resources Code section 4292.

35.     Public Resources Code section 4293 requires "[d]ead trees, old decadent or rotten trees, trees weakened by decay or disease and trees or portions thereof that are leaning toward the line which may contact the line from the side or may fall on the line shall be felled, cut, or trimmed so as to remove such hazard" and that, depending on a power line's voltage, there is a clearance of between four to ten feet.

36.     CPUC General Order 165 states that the Company must conduct "intrusive" inspections of all wooden poles that are over fifteen years old every ten years, and "detailed" inspections of all of its overhead transformers in urban areas at least every five years.  CPUC General Order 165 also requires that the Company conduct "patrol" inspections of all overhead facilities annually in "Extreme" or "Very High Fire" areas.  A public utility whose failure to perform or inadequate performance of duties required by the California Constitution, a law of the State, or a regulation or order of the CPUC, which leads to the loss or injury, is liable for that loss or injury, pursuant to Public Utilities Code section 2106.

37.     To limit the risk of fires, CPUC oversees utility companies' PSPS programs.  Electric investor-owned utilities ("IOUs") that use PSPS programs as a measure to mitigate catastrophic wildfire risks must do so in a manner consistent with their statutory obligations under Public Utilities Code sections 451 and 399.2 and related orders of the CPUC.   Since 2008, the Commission has developed a comprehensive policy framework to regulate the IOU use and implementation of PSPS and has enforced those rules.

38.     The CPUC maintains a FireThreat Map. This map designates the Eaton Canyon area, where the Eaton Fire burned, as a "Tire 3" fire risk. This designation means that there is "an extreme risk from wildfires associated with overhead utility

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

power lines or overhead utility power-line facilities also supporting communication facilities." As such, the CPUC states that "Tier 3 is distinguished from Tier 2 by having the highest likelihood of utility-associated fire initiation and growth that would impact people or property, and where the most restrictive utility regulations are necessary to reduce utility fire risk."

39.     In July 2022, CPUC staff created a single document incorporating all the various guidelines and rules adopted by the CPUC on PSPS.  This document is referred to as the Unofficial Compendium to acknowledge that this document has not been adopted by the Commission but instead represents staff's effort to organize PSPS rules and guidelines by subject matter category to facilitate increased understanding of these rules and guidelines.  Regarding the de-energization of transmission lines, the Unofficial Compendium state, in part, that:

> The electric IOUs must design interim protocols for the de-energization of transmission lines based upon the impacts to populations across affected jurisdictions including, but not limited to, POUs/electric cooperatives, adjacent jurisdictions and small/multi-jurisdictional utilities and critical facilities interconnected at the transmission level.

40.     These statutes and supporting regulatory orders and rules are required as wildfires in California caused by electrical equipment is a real and substantial danger, as is well known to the Individual Defendants.  Since 1992, more than 3,600 wildfires in California have been linked to power lines and other electrical equipment.  In 2023, electrical equipment caused 479 fires in California.

41.     Edison claimed that SCE uses its Public Safety Power Shutoffs ("PSPS") program to "proactively de-energize power lines to mitigate the risk of catastrophic

- 8 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   wildfires during extreme weather events."

2   **Company's History with Wildfires**

3       42.     Prior to the outbreak of the Eaton Fire, the Company had a long history

4   of not prioritizing the safety of those who lived in the areas it serviced, and paying

5   fines as a result. For example, in the 1990s, SCE's equipment and improper

6   maintenance caused numerous fires, such as the 1993 San Bernardino Mill Creek fire

7   which was caused by SCE's power lines. Similarly, in 1997, a 25,000-acre fire broke

8   out in Riverside County, California, having been caused by the Company's failure to

9   perform proper vegetation management near its power lines.

10      43.     In 2006, SCE paid $14 million in order to settle a federal lawsuit due to

11  the Company's contribution to the 1994 Big Creek Forest fire. The Big Creek Forest

12  fire had supposedly been due to the Company's inability to adhere to vegetation

13  clearance requirements, while Company employees were ill equipped to stop the fire

14  before it spread.

15      44.     Just one year later, in 2007, SCE contributed to the Malibu Canyon fire.

16  The Malibu Canyon fire broke out when three wooden utility poles snapped in high

17  Santa Ana winds. These poles then ignited the nearby brush that had not been properly

18  cleared, resulting in 3,836 acres being burned. SCE later admitted to misleading

19  investigators who were investigating the fire by, *inter alia*, "fail[ing] to address

20  failures in record-keeping and construction when a newly-installed replacement pole

21  failed [General Order] 95's safety standards," and by "1) not identifying pole

22  overloading and termite damage as possible factors in the pole failures; 2) not

23  providing SED with an accurate copy of an SCE employee's field notes; and 3) not

24  admitting that not all relevant evidence had been preserved." As a result, SCE was

25  fined $37 million by CPUC for its role in the fire.

26      45.     In 2009, SCE settled with an orchard owner whose trees had been burned

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

by a fire that was started by a downed SCE power line, costing the Company another $1 million. SCE also paid out unknown settlements to other property owners who suffered damage in the fire.

46.    In 2011, a tree falling onto SCE power lines in the San Bernardino National Forest caused a fire, in which the Company paid the United States Government $9.4 million in damages. During its investigation, the government also claimed that SCE had failed to address the potential for such a situation from occurring.

47.    In 2017, wildfires broke out throughout Southern California, eventually expanding to Ojai, Santa Paula, Fillmore, Ventura, and Santa Barbara counties. This massive fire became known as the Thomas fire, which overtook almost 282,000 acres of Ventura and Santa Barbara counties, consuming 1,000 structures and causing two deaths. A subsequent investigation determined that Company equipment was the cause of two separate ignitions near Santa Paula. As a result of this fire, the Company paid the U.S. Government $80 million on behalf of the U.S. Forest Service in February 2024.

48.    Mere hours after the Thomas fire broke out, on December 5, 2017, another wildfire was reported in Santa Clarita in Los Angeles County, known as the Rye fire. The Los Angeles County Fire Department's investigation into the Rye fire determined that the Company's power lines were the cause of the blaze, which destroyed six structures and damaged three others.

49.    Later that same day, a grass fire known as the Meyers fire broke out near Glen Helen Regional Park in San Bernardino County, which again was linked to the Company's power lines.

50.    On December 7, 2017, a fire known as the Liberty fire was reported in Murrieta, California. The Liberty fire was found to have been caused by a switch on

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

a pole failing and subsequently lighting the vegetation surrounding the base of the pole.

51.    On November 8, 2018, a fire, dubbed the Woolsey fire, was started after a loose wire controlled by the Company came in contact with conductors, resulting in a spark setting the surrounding vegetation on fire. The Woolsey fire burned through Los Angeles and Ventura counties, destroying over 90,000 acres and over 1,600 structures.

52.    In September 2020, a fire, later referred to as the Bobcat fire, broke out near Cogswell Dam in Los Angeles County. It was determined that the cause of the Bobcat fire was an SCE-owned power line's contact with a tree. The Bobcat fire burned 116,000 acres, destroyed 87 homes, 1 commercial property, and 83 minor structures, and further damaging 28 homes and 19 minor structures.

53.    Just one month later, on October 26, 2020, during a Santa Ana wind event, the Company's power lines caused a fire that became known as the Silverado fire, which burned over 10,000 acres.

54.    In May 2022, a fire referred to as the Coastal fire destroyed 20 residential structures and damaged 11 others. SCE later reported that, two minutes before the reported time of the fire, an SCE circuit in the area of ignition experienced an anomaly.

55.    In September 2022, a fire known as the Fairview fire burned 28,000 acres and destroyed 22 residential structures, damaging five others. Similar to the Coastal fire, an SCE circuit in the area of ignition had experienced an anomaly 8 minutes before the reported time of the fire.

56.    In total, since 2000, the Company and SCE have accumulated over $1.3 billion in penalties.

- 11 -

**The Company's Equipment Created Wildfire Risk**

57.    For an electric utility company, it is essential that its transmission and distribution ("T&D") components – the transmission lines, substations, distribution lines, and transformers which make up the Electricity Delivery Network in the United States[1] – are maintained properly in order to be safe, reliable, and resilient.    The electric power industry has certain inherent hazards and risks, primarily due to the fact that the T&D components collectively deliver "[a]pproximately four trillion kWh of electric energy" annually across the United States[2] and T&D components are exposed to a variety of extreme weather events, as well as general wear and tear.

58.    As early as 2013, the Company's equipment was considered outdated and at risk of creating fires. On August 20, 2023, NBC News Los Angeles published an article which revealed that, according to a study ordered by the CPUC as the result of massive power outages in SCE's service area, almost 22.3% of the over 5,000 power poles sampled did not meet standards intended to prevent against failure or collapse. At the time of this study, SCE had over 1.4 million poles, meaning that over 300,000 of these poles likely were at issue. The article also revealed the connection between the Company's power lines and the Malibu Canyon fire in 2007.

59.    The 2013 application revealed that "SCE's electric and telecommunications facilities are attached to over 1.4 million poles which range from less than one year to nearly 100 years of age." (Emphasis added). In addition, the application revealed that "recent events, including the Malibu Canyon Fire in October 2007 and the November 2011 San Gabriel Valley windstorm, have shown that some

---

[1]    *See* U.S. Department of Energy, *Transmission and Distribution Components*, Quadrennial Technology Review 2015 (2015), https://www.energy.gov/sites/prod/files/2015/09/f26/QTR2015-3F-Transmission-and-Distribution_1.pdf.

[2]    *Id.*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

of the poles that failed during those incidents did not meet minimum pole loading criteria when measured against today's standards."

60.    In addition, the 2013 application also revealed that the Company intended to pursue a pole-loading program to inspect and assess its 1.4 million poles over a seven-year period with the intent of identifying, and then fixing, any poles that do not adhere to the current standard. Based on this plan, SCE would need to assess over 205,000 poles each year.

61.    In September 2016, SCE filed its General Rate Case application for 2016. The 2016 application revealed that the Company had only completed 184,461 pole assessments in 2014, and 142,519 assessments in 2015, well below the 205,000 annual goal. In addition, the Company was repairing the poles even slower, with only 20 total repairs in 2014, and 569 in 2015.

62.    In January 2017, the Risk Assessment and Safety Advisory staff of the CPUC's Safety and Enforcement Division ("SED") issued a report criticizing SCE's ability to identify potential safety issues with its infrastructure, stating that "SCE's approach to identify threats ... suffers from an almost nonexistent level of granularity" and that "SCE's risk-assessment methods as a basis for determining [the] reasonableness of safety-related program requests" should be cause for concern by the CPUC.

63.    Following the Woolsey fire in November 2018, an investigation conducted by SED resulted in 26 violations of the Public Utilities Code and CPUC Rules being accredited to SCE. Among these violations included, *inter alia*, failure to maintain clearance of wires from other wires and above railroads, throughfares, ground or water surfaces; exposed cables and wires; inadequate design, construction and maintenance of overhead electrical lines and communication facilities; inadequate management of vegetation; deficient inspection of lines; and failing to

- 13 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  properly cooperate with Commission staff.

2      64.    On October 31, 2024, in response to SCE's request to change its Wildfire

3  Mitigation Plan, the California Office of Energy Infrastructure Safety issued a report

4  requesting SCE provide a detailed plan in completing SCE's backlog of overdue work

5  orders for their assets. In addition, the report was critical and revealed doubts as to

6  whether SCE was keeping up with the inspections and repairs necessary on its aging

7  power lines.

8      65.    SCE's inspections alone were inadequate, as a review of the visual

9  inspections of splices in the transmission lines showed that SCE's inspections were

10  not adequately identifying any issues with the splices. It was noted that upon an x-ray

11  of the splices on SCE's transmission lines, there was a priority issue in 88% of splices

12  that had undergone a detailed inspection in the preceding 60 days.

13  **The Eaton Canyon Fire**

14      66.    In the years leading up to the summer of 2024, there had been above-

15  average rainfall in the Eaton Canyon area. This in turn led to the growth of more

16  vegetation, and fuel for fires. During the summer of 2024, the region experienced

17  extreme heat and below-average rainfall, thus drying out the vegetation that had

18  grown in the area. Summer 2024 was the hottest ever recorded in Southern California.

19      67.    In December 2024, the month preceding the Eaton Fire, there was no

20  measurable rainfall recorded in the Eaton Canyon area, compared with an annual

21  average rainfall of 3.3 inches. Throughout the entirety of Los Angeles County,

22  December 2024 was the tenth driest in the past 130 years.

23      68.    As a result of this lack of rain, in the time preceding the outbreak of the

24  Eaton Fire, government agencies and news outlets were reporting that the rapidly

25  intensifying drought conditions also created a heightened wildfire risk. As was

26  reported by the U.S. Drought Monitor, by January 7, 2025, 59.57% of Los Angeles

27

28                                        - 14 -

County, including the Eaton Canyon area, were under severe drought conditions.

69.    On Friday, January 3, 2025, at 3:17 p.m., the National Weather Service Los Angeles ("NWS-Los Angeles") issued a Fire Weather Watch effective from Tuesday, January 7th, through Friday, January 10th in Los Angeles and Ventura Counties. NWS-Los Angeles noted Critical Fire Conditions would be present and that "any fire starts may grow rapidly in size with extreme fire behavior."[3]



70.    On January 5th, Los Angeles County and NWS-Los Angeles issued a Red Flag Warning and High Wind Warning for most of Los Angeles County.[4] In its alert, NWS-Los Angeles specifically stated, "Widespread damaging wind gusts 50-80 mph, Isolated 80-100 mph for mountains/foothills." Eaton Canyon, being in the mountains of Los Angeles County, was at risk of 80-100 mph wind gusts and yet SCE decided to keep many parts of its distribution circuit in and near Eaton Canyon energized.

---

[3]    National Weather Service Los Angeles (@NWSLosAngeles), X.COM (Jan. 3, 2025, 3:17 PM), https://x.com/NWSLosAngeles/status/1875320550094147720.
[4]    Ready Los Angeles County (@ReadyLACounty), X.COM (Jan. 5, 2025, 3:34 PM), https://x.com/ReadyLACounty/status/1876049706494972360.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



71.    On January 6th at 6:47 p.m., NWS-Los Angeles Issued another alert stating: "HEADS UP!!! A LIFE-THREATENING, DESTRUCTIVE, Widespread Windstorm is expected Tue afternoon-Weds morning across much of Ventura/LA Co. Areas not typically windy will be impacted. See graphic for areas of greatest concern. Stay indoors, away from windows, expect power outages."[5] Specifically, NWS-Los Angeles stated that its Locations of Greatest Concern included the San Gabriel Valley, Pasadena, and Altadena from the afternoon of Tuesday January 7th to the morning of Wednesday January 8th.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[5]    National Weather Service Los Angeles (@NWSLosAngeles), X.COM (Jan. 6, 2025, 11:00 AM), https://x.com/NWSLosAngeles/status/1876343016526598292.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



72.    On January 6th at 6:47 p.m., NWS-Los Angeles declared the Red Flag warning to be a "Particularly Dangerous Situation" warning of "widespread damaging wind gusts 50-80 mph, Isolated 80-100 mph for mountains/foothills. Downed Trees and power outages. Use extreme caution with any potential ignition sources."[6]

73.    NWS-Los Angeles warnings proved highly accurate: on January 7th it recorded wind gusts as high as 99 miles per hour in Altadena.[7]

74.    In its California Fire Weather Annual Operating Plan, the California Wildfire Coordinating Group defined a "Red Flag Warning Particularly Dangerous Situation" classification to "highlight exceptional fire weather conditions (combination of meteorological and fuels) considered rare and/or especially impactful

---

[6]    National Weather Service Los Angeles (@NWSLosAngeles), X.COM (Jan. 6, 2025, 6:47 PM), https://x.com/NWSLosAngeles/status/1876460729848782871.

[7]    Renee Straker, *Senior Centers Frantically Evacuated As Eaton Wildfire Closed In On Altadena, California*, The Weather Channel (Jan. 9, 2025) https://weather.com/news/news/2025-01-08-senior-centers-evacuated-amid-eaton-wildfire-altadena-california.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

to the public and firefighting community."[8] These risks are so exceptional that they represent the most severe hazard the National Weather Service can designate according to its own Red Flag Weather Matrix.

| Red Flag Weather Matrix | | Sustained Winds | | | | |
|---|---|---|---|---|---|---|
| | | <6 mph | 6--11 mph | 12-20 mph | 21-29 mph | 30+ mph |
| H u m i d i t y | Daytime Min <29-42% and/or Night Max 60-80% | | | | | RFW |
| | Daytime Min <19-28% and/or Night Max 46-60% | | | | RFW | RFW |
| | Daytime Min <9-18% and/or Night Max 31-45% | | | RFW | RFW | RFW |
| | Daytime Min <9% and/or Night Max <31% | | RFW | RFW | RFW | PDS RFW |

75. At approximately 6:10 p.m. on January 7, 2025, Brendan Thorn, a Pasadena resident living on Canyon Close Road adjacent to Eaton Canyon, noticed his power flicker and a few minutes later a neighbor called him to say there was a fire under the power lines in Eaton Canyon. Thorn stated, "Sure enough, I walk outside and those towers right up there at the very base of it, right around the bottom there was a fire maybe knee-high starting about there."[9]

76. Harry Kertenian, who owns a home on Lindaloa Lane in the Kinneloa Mesa neighborhood to the east of Eaton Canyon, told reporters that his mother told him she saw the power lines sparking.[10] Kertenian, who has lived in the area for more

---

[8] *California Fire Weather Annual Operating Plan 2024*, California Wildfire Coordinating Group (Apr. 30, 2024), https://www.weather.gov/media/wrh/cafw/2024_CA_FIRE_AOP.pdf.

[9] Rob Hayes, *Cause of Eaton Fire may be downed power line, witness says*, ABC 7 (Jan. 10, 2025), https://abc7.com/post/california-wildfire-cause-eaton-fire-may-downed-power-linewitness-says/15788334/.

[10] *Id.*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

than two decades, says he hikes the Eaton Canyon Valley all the time and noticed that the whole Eaton Wash area has been full of dry debris and dead brush.

77.    At approximately 6:15 p.m. on January 7, 2025, Altadena residents Jennifer Errico and Marcus Errico observed the ignition of the Eaton Fire underneath an electrical tower across the canyon from their home on the 2500 block of Canyon View Drive in Pasadena, CA 91107. Before evacuating, Jennifer and Marcus took photographs of the fire underneath what they described as "giant, giant towers" across from where Midwick Drive intersects with North Altadena Drive.[11] The images they took from their backyard are below.



78.    After burning for 24 days, the Eaton Canyon Fire was contained on January 31, 2025. The fire burned approximately 14,021 acres, killed at least 18 people, and destroyed more than 9,000 buildings.

**The Hurst Fire**

79.    Similar to the Eaton Canyon Fire, on January 7, 2025, at 10:10 p.m., under conditions of an extreme windstorm, the Hurst Fire broke out in the Sylmar

---

[11]    James MacPherson, *The Moment the Eaton Fire Ignited*, Pasadena Now (Jan. 9, 2025), https://pasadenanow.com/main/the-moment-the-eaton-fire-ignited.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

area. Within less than an hour, the Hurst Fire spread over 100 acres. As a result, evacuation orders were issued for all areas north of the Foothill Freeway.



80.     By the early hours of January 8, 2025, the Hurst Fire had spread to 500 acres.

81.     On January 16, 2025, the Hurst Fire was fully contained after burning 799 acres. More than 44,000 people were given evacuation orders, with an additional 27,000 receiving evacuation warnings.

**The Impact of the Fires**

82.     In addition to the 18 fatalities and the destruction of thousands of the buildings, the fires had further impacts on the surrounding area and people, including, *inter alia*, power outages, decline in air quality, contamination of water, and injury.

83.     By the night of January 7, nearly 50,000 customers suffered power outages, 28,300 under the Los Angeles Department of Water and Power and 21,699 under SCE. The number in the Los Angeles metropolitan area alone increased to over 200,000 by around 9:30 p.m. PST, with outages reported in Los Angeles, Glendale, Pasadena, and Burbank. SCE later stated that, at 4 p.m. PST on January 8, about 414,000 of its customers are without power and 454,000 customers are under a Public Safety Power Shutoff program watch. As of January 12, 2025, 35,000 customers were

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    still left without electricity.

2        84.    Additionally, winds blew wildfire smoke across Los Angeles, having an

3    adverse impact on the air quality in the area. Air quality degraded to 569 μg/m³ in the

4    region, representing the most hazardous category and necessitating avoidance of all

5    outdoor activity.

6        85.    According to JPMorgan estimates published on January 9, the insured

7    losses from the fires were projected to exceed $20 billion.

8        **MATERIALLY FALSE AND MISLEADING STATEMENTS**

9        86.    On February 25, 2021, Edison filed a Form 10-K for the fiscal year ended

10   December 31, 2020 (the "2020 10-K"). The 2020 10-K was signed by Defendants

11   Pizarro, Rigatti, Beliveau-Dunn, Camuñez, Chang, Morris, O'Toole, Smith, Stuntz,

12   Sullivan, Taylor, and Trent. The 2020 10-K stated, in pertinent part, "SCE also uses

13   its PSPS program to proactively de-energize power lines to mitigate the risk of

14   catastrophic wildfires during extreme weather events."

15       87.    On March 12, 2021, the Company filed with the SEC its 2021 Proxy

16   Statement which solicited shareholder approval for, *inter alia*: (i) the election of

17   Defendants Beliveau-Dunn, Camunez, Chang, Morris, O'Toole, Pizarro, Smith,

18   Stuntz, Taylor, and Trent to the Board; and (ii) the compensation of executive officers.

19       88.    In the opening letter to shareholders, penned by Defendant Pizarro, the

20   2021 Proxy Statement stated that "[b]ased in California, we know first-hand the

21   devastating impacts of climate change in the form of severe weather events, prolonged

22   drought and catastrophic wildfires and are focused on adapting our business. Since

23   2018, SCE has invested approximately $3 billion in system hardening, grid

24   modernization and other wildfire mitigation efforts to reduce the threat of ignitions

25   caused by the electric system that could lead to wildfires."

26       89.    In a section entitled "Safety and Health," the 2021 Proxy Statement

27

28                                    - 21 -
     VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    stated the following:

3        We are also committed to upholding the highest levels of public safety.

4        Expanding our wildfire mitigation, response, and recovery efforts by

5        improving the resiliency and security of SCE's grid has been a key focus

6        area. In addition, we remain focused on our preparation for, and response

7        to, other types of disasters and emergencies that can impact public safety

8        and our operations.

10       90.    The 2021 Proxy Statement contained the following information

11   regarding "Wildfire Risk Mitigation":

13       In recent years, Californians have increasingly experienced historic and

14       destructive wildfires demonstrating the climate change impacts of

15       extreme weather events and prolonged drought conditions. SCE's 2020-

16       2022 wildfire mitigation plan ("WMP"), required by California law and

17       reviewed and approved by the California Public Utilities Commission

18       ("CPUC"), outlines SCE's strategies, programs and activities to

19       proactively mitigate the risk of utility infrastructure igniting catastrophic

20       wildfires in SCE's high fire risk area ("HFRA"), which represents about

21       27% of SCE's service area.

23       The primary objective of SCE's WMP is to safeguard public safety by

24       hardening the grid, bolstering situational awareness capabilities and

25       enhancing operational practices. In 2020, the WMP focused on

26       deploying covered conductor to insulate bare wire from the risk of tree

- 22 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

branches and other debris carried by high winds, causing an ignition. It also included enhanced inspections across HFRAs with risk-informed prioritization. The WMP also prioritized vegetation management for hazard trees and drought-ridden dead and dying trees in HFRAs, supporting both risk reduction and healthy forest management practices. SCE also utilized preemptive Public Safety Power Shutoff ("PSPS") de-energization for certain segments of circuits during high wind events to reduce the risk of an ignition becoming a catastrophic wildfire event. Understanding the impact to customers without power during extreme wind events, SCE also deployed customer care programs including community resource vehicles to support impacted customers. SCE continues to work with state and local emergency management agencies, local governments and community leaders to improve PSPS operations and reduce the frequency and impact on customers. Despite the challenges posed by COVID-19, we met nearly all of the 2020 goals in SCE's WMP, including the installation of more than 950 circuit miles of covered conductor, 6,000 fire resistant poles and 575 weather stations in HFRAs, while removing more than 12,000 hazard trees that could fall into power lines and lead to an ignition.

SCE's 2021 WMP update, recently filed with the CPUC, builds upon its 2020 activities with plans for enhanced risk analysis, expanded inspection and system hardening activities, aerial fire suppression, technology improvements for data management and analytics, and new work management tools for inspection and vegetation management. In addition, SCE remains committed to finding opportunities to reduce the

- 23 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

size, frequency and duration of PSPS events during severe weather events and high fire potential conditions, and continue to enhance our community engagement before and during these events.

91.    In a section describing the role of the "Safety and Operations Committee," comprised of Defendants Beliveau-Dunn, O' Toole, Smith, Stuntz, Taylor, and Trent, the 2021 Proxy Statement stated the following:

The Safety and Operations Committee is composed of six independent directors with relevant safety experience. The Committee's key responsibilities include the following:

■ Review and monitor the Company's safety programs, policies and practices relating to:

   ■ The Company's safety culture, goals and risks;

   ■    Significant  safety-related  incidents  involving  employees, contractors or members of the public; and

   ■ The measures and resources to prevent, mitigate or respond to safety-related incidents.

■ Monitor the Company's safety, wildfire and operational and service excellence performance metrics.

- 24 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

■ Review and monitor the Company's operations, significant developments, resources, risks and risk mitigation plans relating to:

■ Reliability, affordability and customer service;

■ Wildfires;

■ Cyber and physical security;

■ Business resiliency and emergency response;

■ Information technology; and

■ Decommissioning of the San Onofre Nuclear Generating Station.

92.    In a section entitled "Safety," the 2021 Proxy Statement stated the following:

The safety of employees, contractors, customers and the public is essential to the Company's values and success. As part of its oversight function, the Board engages directly with management on safety topics, including wildfire mitigation. The Board's Safety and Operations Committee maintains joint responsibility with the Board for safety oversight. As discussed above, the Safety and Operations Committee is responsible for oversight of the Company's safety performance, culture, operational goals and risks, and significant safety-related incidents

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

involving employees, contractors or members of the public, including wildfire safety.

The Board and its Safety and Operations Committee oversee our efforts to develop a culture where employees take ownership of their own safety and the safety of those around them. In 2020, the Board and Committee each reviewed the findings of a safety culture assessment conducted by an outside consultant once every three years, which revealed the progress made on strengthening our safety culture and efforts needed to sustain and continue our cultural improvements.

93.    The foregoing in the 2021 Proxy Statement was materially false and misleading, however, because contrary to its assertions, the Company did not "utilizepreemptive Public Safety Power Shutoff ("PSPS") de-energization for certain segments of circuits during high wind events to reduce the risk of an ignition becoming a catastrophic wildfire event." Nor did the Company's Safety and Operations[] Committee fulfil its duties relating to wildfire prevention and mitigation.

94.    On February 24, 2022, the Company filed a Form 10-K for the fiscal year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K was signed by Defendants Pizarro, Rigatti, Beliveau-Dunn, Camuñez, Chang, Morris, O'Toole, Smith, Stuntz, Sullivan, Taylor, and Trent. The 2021 10-K stated, in relevant part, "SCE also uses its PSPS program to proactively de-energize power lines as a last resort to mitigate the risk of catastrophic wildfires during extreme weather events."

95.    On March 18, 2022, the Company filed with the SEC its 2022 Proxy Statement which solicited shareholder approval for, *inter alia*: (i) the election of Defendants Beliveau-Dunn, Camunez, Chang, Morris, O'Toole, Pizarro, Reed,

- 26 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Smith, Stuntz, Taylor, and Trent to the Board; and (ii) the compensation of executive officers.

96.    In the opening letter to shareholders, penned by "[t]he Board of Directors," the 2022 Proxy Statement stated that:

Key areas of focus for the Board in 2021 included:

[…]

[] Overseeing the execution of Southern California Edison's wildfire risk mitigation programs;

[…]

97.    In a separate shareholder letter, penned by Defendant Pizarro, the 2022 Proxy Statement stated: "We are also evaluating long-term risk reduction related to the impacts of climate change, such as increased frequency of severe weather events, sea level rise, intensified conditions for wildfires and cascading events. SCE is conducting a comprehensive analysis of climate change exposure, vulnerabilities and adaptation strategies for utility infrastructure to achieve long-term resilience. This is in addition to SCE's ongoing work to implement wildfire risk mitigation measures, including grid hardening, enhanced inspections, expanded vegetation management and targeted de-energization. As a result, SCE estimates it has reduced the probability of losses from catastrophic wildfires by 65–70%, relative to pre-2018 levels."

98.    In a section describing the role of the Safety and Operations Committee, comprised of Defendants Beliveau-Dunn, O'Toole, Smith, Reed, Taylor, and Trent,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the 2022 Proxy Statement stated the same information as in the 2021 Proxy Statement, *supra*.

99.    In a section entitled "Safety," the 2022 Proxy Statement stated the following:

> The safety of employees, contractors, customers and the public is essential to the Company's values and success. As part of its oversight function, the Board engages directly with management on worker and public safety topics, including wildfire safety. The Board's Safety and Operations Committee maintains joint responsibility with the Board for safety oversight. As discussed above, the Safety and Operations Committee is responsible for oversight of the Company's safety performance, culture, operational goals and risks, and significant safety-related incidents involving employees, contractors or members of the public, including wildfire safety.

100.    The foregoing in the 2022 Proxy Statement was materially false and misleading, however, because contrary to its assertions, the Company did not effectively oversee or manage its wildfire mitigation strategies, nor did the Company's Safety and Operations Committee fulfil its duties relating to wildfire prevention and mitigation.

101.    On February 23, 2023, the Company filed a Form 10-K for the fiscal year ended December 31, 2022 (the "2022 10-K"). The 2022 10-K was signed by Defendants Pizarro, Rigatti, Beliveau-Dunn, Camuñez, Chang, Morris, O'Toole, Reed, Smith, Stuntz, Taylor, and Trent. The 2022 10-K stated, in pertinent part, "SCE also uses its PSPS program to proactively de-energize power lines as a last resort to

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

mitigate the risk of significant wildfires during extreme weather events."

102.  On March 17, 2023, the Company filed with the SEC its 2023 Proxy Statement which solicited shareholder approval for, *inter alia*: (i) the election of Defendants Beliveau-Dunn, Camunez, Chang, Morris, O'Toole, Pizarro, Reed, Smith, Stuntz, Taylor, and Trent to the Board; and (ii) the compensation of executive officers.

103.  In the opening letter to shareholders, penned by Defendants Pizarro and Taylor, the 2023 Proxy Statement stated:

**Mitigating Wildfire Risk and Adapting to Climate Change**

We continue to directly address the impacts of climate change with SCE's significant advancement of grid hardening, situational awareness and operational enhancements, primarily focused on reducing wildfire risk. SCE has successfully executed its wildfire mitigation plan and now estimates it has reduced the probability of losses from catastrophic wildfires by 75 to 80% compared to pre-2018 levels. In 2022, SCE also completed the first utility climate adaptation vulnerability assessment in California; our Adapting for Tomorrow policy paper detailed anticipated climate impacts to utility assets, operations and services and proposed long-term actions needed to address resiliency, which will be factored into future investment needs. We also called for increased collaboration among industry, governments and communities to successfully adapt while transitioning to an equitable clean energy future.

\*\*\*

- 29 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Board Oversight and Accountability**

As discussed in the Proxy Statement, the Board provides effective oversight of the Company's strategy, risk management, operations, and related environmental, social and governance ("ESG") issues. The Board takes its oversight responsibilities seriously and is committed to providing long-term, sustainable value to the Company and its stakeholders. In 2022, the Board focused on the core utility business, the prioritization of wildfire risk reduction and advancing our clean energy strategy. The Board also addressed emerging risks brought on by macroeconomic factors and market volatility, geopolitical unrest abroad, and subsequent issues like heightened cybersecurity and supply chain risks.

104.    In a section describing the role of the Safety and Operations Committee, comprised of Defendants Beliveau-Dunn, O'Toole, Smith, Reed, and Trent, the 2023 Proxy Statement stated the same information as in the 2021 Proxy Statement, *supra.*

105.    In a section regarding the Company's strategy, the 2023 Proxy Statement stated the following:

With the Board's guidance, SCE also continued to make meaningful progress on its wildfire risk mitigation strategy, achieving important milestones related to covered conductor deployment and other system hardening activities, vegetation management, high fire risk area inspections, and technology and data analytics.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

106.   In a section entitled "Safety," the 2023 Proxy Statement stated the following:

> The safety of employees, contractors, customers and the public is essential to the Company's values and success. As part of its oversight function, the Board engages directly with management on worker and public safety topics, including wildfire safety. The Board's Safety and Operations Committee maintains joint responsibility with the Board for safety oversight. As discussed above, the Safety and Operations Committee is responsible for oversight of the Company's safety performance, culture, operational goals and risks, and significant safety-related incidents involving employees, contractors or members of the public, as well as wildfire safety.

107.   The foregoing in the 2023 Proxy Statement was materially false and misleading, however, because contrary to its assertions, the Company did not effectively "make meaningful progress on its wildfire risk mitigation strategy, achieving important milestones related to covered conductor deployment and other system hardening activities," nor did the Company's Safety and Operations Committee fulfil its duties relating to wildfire prevention and mitigation.

108.   On February 22, 2024, the Company filed a Form 10-K for the fiscal year ended December 31, 2023 (the "2023 10-K"). The 2023 10-K was signed by Defendants Pizarro, Rigatti, Beliveau-Dunn, Camuñez, Chang, Morris, O'Toole, Reed, Smith, Stuntz, Taylor, and Trent. The 2023 10-K stated, in relevant part, "SCE also uses its PSPS program to proactively de-energize power lines as a last resort to mitigate the risk of significant wildfires during extreme weather events.

- 31 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

109.   On March 15, 2024, the Company filed with the SEC its 2024 Proxy Statement which solicited shareholder approval for, *inter alia*: (i) the election of Defendants Beliveau-Dunn, Camunez, Chang, Morris, O'Toole, Pizarro, Reed, Smith, Stuntz, Taylor, and Trent to the Board; and (ii) the compensation of executive officers.

110.   In a letter to shareholders, penned by Defendants Pizarro and Taylor, the 2024 Proxy Statement stated the following:

**Wildfire Risk Mitigation and Climate Adaptation**

SCE continues to successfully implement its wildfire mitigation plan to address the impacts of climate change, reduce wildfire risk and protect public safety. SCE's grid hardening, situational awareness and operational enhancements have resulted in more than 5,500 miles of covered conductor installation, two million tree trims and removals of dead or dying trees, one million inspections in high-fire risk areas, and 1,700 weather station installations since 2018. Based on independent estimates from third-party wildfire risk modeling, these concerted efforts have reduced the probability of losses from catastrophic wildfires linked to SCE equipment by approximately 85-88% compared to pre-2018 levels.

We are now seeing the effects of climate-change-driven wildfires throughout the nation, particularly with the heart-wrenching fire in Maui and fires in places like Louisiana, Texas and the East Coast. These unfortunate events demonstrate the need to build on SCE's progress by

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

continuing to collaborate with industry peers, governments and communities to further enhance resiliency and adapt to climate change as we transition to a clean energy future.

***

**Board Oversight and Accountability**

As discussed in the Proxy Statement, the Board provides effective oversight of the Company's strategy, risk management, operations, and related environmental, social and governance ("ESG") issues. The Board takes its oversight responsibilities seriously and is committed to providing long-term, sustainable value to the Company and its stakeholders. In 2023, the Board continued to focus on safety, reliability and affordability issues related to the core utility business, wildfire risk reduction priorities, and advancing our clean energy strategy. The Board also addressed emerging issues related to cyber and physical security, disruptive technologies, and macroeconomic factors such as inflation and geopolitical tensions.

111.  In a section describing the role of the Safety and Operations Committee, comprised of Defendants Beliveau-Dunn, O'Toole, Smith, Reed, and Trent, the 2024 Proxy Statement stated the same information as in the 2021 Proxy Statement, *supra.*

112.  In a section discussing the Company's "Strategy," the 2024 Proxy Statement stated the following:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

With the Board's guidance, SCE also continued to make meaningful progress on its wildfire risk mitigation strategy, achieving important milestones related to covered conductor deployment and other system hardening activities, vegetation management, high fire risk area inspections, and technology and data analytics.

113.   In a section discussing "Safety," the 2024 Proxy Statement stated the following:

The safety of employees, contractors, customers and the public is the first of the Company's values and essential to its success. As part of its oversight function, the Board engages directly with management on worker and public safety topics, including wildfire safety. The Board's Safety and Operations Committee maintains joint responsibility with the Board for safety oversight. As discussed above, the Safety and Operations Committee is responsible for oversight of the Company's safety performance, culture, operational goals and risks, and significant safety-related incidents involving employees, contractors or members of the public, as well as wildfire safety.

114.   The foregoing in the 2024 Proxy Statement was materially false and misleading, however, because contrary to its assertions, the Company did not effectively "make meaningful progress on its wildfire risk mitigation strategy, achieving important milestones related to covered conductor deployment and other system hardening activities," nor did it "reduce wildfire risk and protect public safety," despite being aware of recent wildfires in Maui, Louisiana, and Texas. The

- 34 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

2024 Proxy Statement was also false and misleading because, contrary to its assertions, the Company's Safety and Operations Committee did not fulfil its duties relating to wildfire prevention and mitigation

115. On January 7, 2025, the Company stated that it de-energized its distribution lines to the west of Eaton Canyon through a PSPS, recognizing the NWS-LA's severe PDS Red Flag Warning on January 6, 2025.

116. Edison obfuscated the truth by making false and misleading statements concerning its role in the fire. On January 8, 2025, Edison issued a press release stating, in relevant part:

> Tuesday afternoon in SCE's service area. SCE has transmission facilities on the east side of Eaton Canyon. ***SCE's distribution lines immediately to the west of Eaton Canyon were de-energized well before the reported start time of the fire, as part of SCE's Public Safety Power Shutoff (PSPS) program.*** SCE is currently conducting a review of the event. The Hurst Fire began late Tuesday evening. While the reported ignition site is within the Los Angeles Department of Water and Power's service area, SCE has transmission facilities near the reported ignition site, and the company is currently conducting a review of the event.

(Emphasis added.)

117. The above-referenced statements were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to the Individual Defendants or recklessly disregarded by them. Specifically, the Individual Defendants made false and/or misleading statements and/or failed to

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

disclose that: (i) Edison's claim that Southern California Edison Company ("SCE") used its PSPS program to "proactively de-energize power lines to mitigate the risk of catastrophic wildfires during extreme weather events", was false; (ii) the Company's faulty infrastructure was a likely cause of the wildfires; (iii) this resulted in heightened fire risk in California and heightened legal exposure to the Company; and (iv) as a result, the Individual Defendants' statements about Edison's business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all times.

## THE TRUTH EMERGES

118. The truth of the fire's source was unknown to the public at the time, as residents were busy evacuating. Indeed, news concerning the source of the Eaton Canyon Fire's source would not be known until days after the fire started.

119. On January 9, 2025, the *Pasadena Now* article titled, "The Moment the Eaton Fire Ignited" was published, reporting from eyewitnesses that the Eaton Canyon Fire originated near electrical towers, although the article did not name Edison or SCE as the entities responsible for operating said towers.

120. On this news, Edison share prices dropped $4.50, or approximately 6.47%, from closing at $69.50 on January 8, 2025 to close at $65.00 on January 10, 2025, the next trading day.

121. On January 12, 2025, Edison issued a press release, stating in relevant part:

> SCE filed two Electric Safety Incident Reports (ESIR) related to current wildfires, one for the Eaton Fire and another for the Hurst Fire. ESIRs are filed with the California Public Utilities Commission (CPUC) for incidents that meet certain criteria, such as significant media attention or

- 36 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

a governmental investigation. These brief reports contain preliminary information and are provided within two to four hours after a triggering event. To comply with CPUC requirements, these reports are often submitted before SCE can determine whether its electric facilities are associated with an ignition.

Eaton Fire

On Jan. 9, SCE filed an ESIR related to the Eaton Fire, as the incident may have met the reporting requirement, such as significant media attention and property damage exceeding $200,000. Additionally, SCE received evidence preservation notices from counsel representing insurance companies in connection with the fire. ***SCE conducted preliminary analysis of electrical circuit information for the four energized transmission lines in the Eaton Canyon area. That analysis shows no interruptions or operational/electrical anomalies in the 12 hours prior to the fire's reported start time until more than one hour after the reported start time of the fire.*** Aside from the preservation notices suggesting SCE's potential involvement and media attention surrounding the fire, SCE would not have filed an ESIR.

(Emphasis added)

122.   While the market was still digesting the news that Edison had, in fact, not de-energized its power lines in the Eaton Canyon area, a lawsuit was filed on Monday, January 13, 2025, alleging that Edison was responsible for the Eaton Canyon Fire. The lawsuit was filed in the Superior Court of the State of California for the

County of Los Angeles and alleged that the fires originated from Edison's power lines. The complaint included eye-witness accounts and photographs that showed the fire was started by Edison's electrical equipment.

123.   On this news, Edison share prices dropped by $7.73, or approximately 11.89%, from closing at $65.00 on January 10, 2025, to close at $57.27 on January 13, 2025, the next trading day.

124.   On January 27, 2025, the Company filed a report regarding the Eaton Fire with CPUC. The report reveals that Edison detected a fault at approximately 6:11 pm, on its Eagle Rock-Gould transmission circuit, at around the same time the Eaton Fire started under the base of SCE's transmission towers in Eaton Canyon. The report also revealed that this fault caused an "increase in current on SCE's transmission system, including on the four energized lines on M16T1 and M24T3." The M16T1 and M24T3 are the two transmission towers in Eaton Canyon, where the Eaton Fire started.

125.   On February 6, 2025, the *Wall Street Journal* published an article titled, "Edison Unit Says Its Equipment May Have Been Involved in SoCal Fires." The article reported that, on that day, SCE "submitted two letters to the California Public Utilities Commission with updates on its analysis of the Eaton and Hurst wildfires, saying it believes its equipment may be associated with the start of the Hurst fire."

126.   On this news, Edison share prices dropped by $1.28, or approximately 2.4%, to close at $51.16 on February 6, 2025.

**SHARE REPURCHASES**

127.   During the Individual Defendants' wrongful course of conduct, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $216.2 million to repurchase approximately 2.4

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

million shares of its own common stock at artificially inflated prices, from April 2024 through November 2024, as follows:

| Date | Units Repurchased | Average Repurchase Price ($) | Total Cost of Repurchases ($) | Total Overpayment ($)[12] |
|------|-------------------|------------------------------|-------------------------------|---------------------------|
| April 2024 | 65,432 | 71.47 | 4,676,425 | 1,328,924 |
| May 2024 | 38,566 | 71.26 | 2,748,213 | 775,177 |
| June 2024 | 1,166 | 72.64 | 84,698 | 25,046 |
| July 2024 | 90,089 | 77.19 | 6,953,970 | 2,345,017 |
| August 2024 | 21,245 | 80.36 | 1,707,248 | 620,354 |
| September 2024 | 660 | 86.03 | 56,780 | 23,014 |
| November 2024 | 2,412,203 | 82.91 | 199,995,751 | 76,587,445 |

128.   As such, while issuing false and misleading statements to the market, the Individual Defendants caused the Company to repurchase over 2.4 million shares of its own common stock at artificially inflated prices, causing it to overpay for its own stock by at least *$81.7 million*.

129.   These harmful actions could not be the product of informed business judgment, nor could they be construed as being in the best interests of the Company. As a result, the Company has suffered substantial harm which was caused by, or otherwise permitted by, each of the Individual Defendants, in direct violation of their fiduciary duties owed to the Company.

## INSIDER TRADING ALLEGATIONS

130.   While disseminating the materially false and misleading statements alleged herein to maintain artificially inflated prices for Edison securities, Defendant

---

[12]   "Total Overpayment" refers to how much the Company overpaid for its own stock and is calculated by subtracting what the Company should have paid for its stock at its true value ($51.16) from the total amount the Company actually paid for its stock.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Taylor enriched by engaging in insider sales of the Company's shares while those shares traded at artificially high prices, as follows:

| Defendant | Date | Units | Share Price | Proceeds |
|---|---|---|---|---|
| Taylor | March 2021 | 231 | 54.6 | 12,612 |
| Taylor | May 2021 | 230 | 59.61 | 13,710 |
| Taylor | August 2021 | 230 | 54.69 | 12,579 |
| Taylor | November 2021 | 220 | 62.44 | 13,737 |
| Taylor | November 2021 | 3,100 | 63.56 | 197,041 |
| Taylor | November 2024 | 1,250 | 83.28 | 104,100 |
| **TOTAL** | **-** | **5,261** | **-** | **353,779** |

## DAMAGE TO THE COMPANY

### Securities Class Action

131.   On February 19, 2025, a securities class action complaint was filed in the United States District Court for the Central District of California against the Company and Defendants Pizarro and Rigatti. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, in the case captioned: *Elliott v. Edison International, et al.*, Case No. 2:25-cv-1383 (C.D. Cal.) ("Securities Class Action").

132.   As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers.  The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results.

### Los Angeles County Lawsuit

133.   On March 5, 2025, the Los Angeles County filed a civil complaint

- 40 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

against the Company for inverse condemnation, negligence, trespass, nuisance, premises liability, violation of Public Utilities Code, and violations of Health and Safety Code in the case captioned: *County of Los Angeles, et al. v. Southern California Edison, et al.*, Case No. 25STCCV06269 (Cal. Super. Ct. LA Cnty.) ("LA Action").

134. As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself against this LA Action. The Company will continue to incur significant sums in relation to the LA Action and any liability or settlement that results.

**Regulatory and Governmental Investigations**

135. As a result of the Individual Defendants' failures as described herein, the Company is now subject to regulatory and governmental investigations. In particular, the Company's February 6, 2025 letter to the Public Utilities Commission stated that: "SCE understands that the Los Angeles County Fire Department (County) is the lead agency investigating the origin and cause of the Eaton Fire, with support from other agencies, including Cal Fire." Accordingly, the Company is being subjected to the costs of complying with these investigations.

**Share Repurchases**

136. The Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $216.2 million to repurchase approximately 2.4 million shares of its own common stock at artificially inflated prices, from April 2024 through November 2024. As the Company's stock was actually worth only $51.16 per share, the price at which it was trading when markets closed on February 6, 2025, the Company overpaid for repurchases of its own stock by approximately $81.7 million.

- 41 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Insider Trading**

137.   As alleged above, while the Company's share price was artificially inflated, and while in possession of material, non-public information regarding the true risk of wildfires and the conditions of the Company's equipment, Defendant Taylor sold his personally held shares of Edison stock for gross proceeds of $353,779.

**Unjust Compensation**

138.   At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

139.   Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner.  Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

140.   However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein.  Because the Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved.  As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Additional Damages**

141.   In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

142.   The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

143.   The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

144.   Moreover, as noted above, it has been estimated that the costs associated with the wildfires could exceed $20 billion.

145.   Since February 2025, the Company has been named in at least 100 private lawsuits related to the Eaton Fire.

146.   In addition, over 100 insurers have named the Company in a suit for over $10 billion in damages as a result of the Eaton Fire. The insurers have either paid or expect to pay money to insured clients for, *inter alia¸* damages to real and personal, additional living expenses, and loss of use and business interruption.

147.   On top of the private lawsuits, Los Angeles County, Pasadena, and Sierra Madre have filed actions against SCE pertaining to the Eaton Fire. These complaints estimate damages to be in the hundreds of millions of dollars, and include damage to county infrastructure, parks, and roads, as well as cleanup and recovery efforts.

## CORPORATE GOVERNANCE

148.   At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

149.   Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable

violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

**Ethics and Compliance Code for Directors**

150.    At all relevant times, the Company had in place its Ethics and Compliance Code for Directors which "outline[s] the manner in which Directors of Edison International and its subsidiaries (the "Company") should conduct themselves so as to avoid conflicts between their financial, business and other activities and their responsibilities as members of the Board(s) of the Company."

151.    The Ethics and Compliance Code for Directors further states that "this Code is intended to serve as a set of foundational principles.  Directors should also use the Company values of Safety, Integrity, Excellence, Respect, Continuous Improvement, and Teamwork, as guides to resolving unique issues." The Ethics and Compliance Code for Directors also requires that "Directors who also serve as officers of the Company must read this Code in conjunction with the Edison International Employee Code of Conduct and related corporate policies, which apply to all employees."

152.    In a section entitled "Compliance with Applicable Laws," the Ethics and Compliance Code for Directors states:

Directors must conduct all their financial, business and other activities in full compliance with applicable laws, rules and regulations.   In addition, Directors must adhere to applicable portions of the following Company policies:    Information Governance;  Disclosure;  Anti-Corruption and Anti-Fraud; Insider Trading; Prohibition of Harassment,

- 44 -

Including Sexual Harassment; and other policies as may be adopted and identified to them from time to time by the CECO or the General Counsel.

**Code of Conduct**

153.   At all relevant times, the Company had in place its Employee Code of Conduct ("Code of Conduct") which "provides a high-level overview of key policies that help us uphold this commitment [to upholding our values and complying with the laws and regulations that apply to our business]."

154.   In a section entitled "The Environment," the Code of Conduct states:

Respect for the natural environment is critical to support our vision to lead the transformation of the electric power industry towards a clean energy future. The company is a steward of the environment by seeking out opportunities to protect the environment, implementing sustainable business practices and complying with environmental laws and regulations. We're all responsible for conducting work in a manner that minimizes impact to the environment, complying with company policies and their implementing documents and taking prompt action to correct environmental issues. Each of us is also responsible for speaking up and stopping work if there is an imminent hazard to the environment.

Protecting and preserving the environment for the communities in which we live and work is an essential responsibility that we take seriously. This responsibility extends to our business partners and suppliers.

- 45 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

155.   In a section entitled "Accurate Books and Records," the Code of Conduct states:

We take care to ensure the integrity of our business records, whether hardcopy or electronic. You're expected to create accurate and complete records, including those that document the company's financial and operational performance, and to retain records pursuant to the company's retention policies.

156.   In a section entitled "External Communication," the Code of Conduct states:

We limit official company communication to authorized spokespersons. Because the information we communicate helps our stakeholders make informed decisions, we work to ensure our public statements are accurate and consistent. In all forms of communication, you may not disclose proprietary company information (e.g., business information or pictures of company facilities) without authorization. We only use company logos, trademarks and other symbols in alignment with our brand style standards and company values. In your personal communications, including on social media, make it clear you are not speaking on behalf of the company and the views expressed are yours alone.

**Safety and Operations Committee Charter**

157.   At all relevant times, the Company had in place its Safety and Operations Committee Charter which set forth the additional duties and responsibilities of the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Safety and Operations Committee members.

158.   The Safety and Operations Committee Charter sets forth the following duties and responsibilities:

The Committee shall have the following duties and responsibilities:

1. Review and monitor the Company's safety programs, policies and practices relating to:

☐ The Company's safety culture, goals and risks;

☐ Significant safety-related incidents involving employees, contractors or members of the public; and

☐ The measures and resources to prevent, mitigate or respond to safety-related incidents.

2. Monitor the Company's safety, wildfire and operational and service excellence performance metrics.

3. Review and monitor the Company's operations, significant developments, resources, risks and risk mitigation plans relating to:

☐ Reliability, affordability and customer service;

☐ Wildfires;

☐ Cyber and physical security;

☐ Business resiliency and emergency response;

☐ Information and operational technology;

☐ Climate adaptation; and

☐ Decommissioning of the San Onofre Nuclear Generating Station.

4. Perform such additional functions as the Committee determines are necessary or prudent to fulfill the Committee's duties and

- 47 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

responsibilities.

**Audit and Finance Committee Charter**

159.   At all relevant times, the Company had in place its Audit and Finance Committee Charter which sets forth the additional duties and responsibilities of the Audit and Finance Committee.

160.   The Audit and Finance Committee Charter sets forth the following duties and responsibilities:

**Risk Management.**

(a) The Committee periodically shall discuss guidelines and policies to govern the process by which risk assessment and risk management is undertaken, and the steps management has taken to monitor and control enterprise level risks.

(b) The Committee shall discuss the Company's major financial risk exposures and the steps management has taken to monitor and control these exposures.

(c) The Committee periodically shall review information provided by management and the Company's legal counsel on litigation and regulatory proceedings.

***

**Other Responsibilities.**

The Committee shall review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Auditors or the performance of the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company's internal audit function.

## **DUTIES OF THE DIRECTOR DEFENDANTS**

161.   As members of The Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies, and assuring the integrity of its financial and business records.

162.   The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company

163.   By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

164.   Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

165.   To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)   ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)   conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)   properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)   remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)   ensure that the Company was operated in a diligent, honest, and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

166.   Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

167.   The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

168.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and other unlawful conduct by the Individual Defendants.

169.   Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

- 51 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

170.   Plaintiff is a current owner of the Company's stock and has continuously been an owner of the Company's stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

171.   During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

172.   The Company's Board is currently comprised of twelve (12) members including Defendants Pizarro, Beliveau-Dunn, Camunez, Chang, Morris, O'Toole, Reed, Smith, Stuntz, Taylor, Trent, and non-party Jennifer M. Granholm ("Granholm") (collectively, the "Current Directors").  Thus, Plaintiff is required to show that a majority of the Current Directors, *i.e.*, six (6), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

173.   Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

174.   The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

steps in a good faith effort to prevent or remedy that situation.

175. The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

176. Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

177. As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

178. Each of the Director Defendants oversaw, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded or failed to oversee the wrongs complained of herein and are therefore not disinterested parties.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

179.   Each of the Director Defendants reviewed, authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

180.   The Director Defendants also each reviewed, approved, and otherwise solicited the false and misleading Proxy Statements which, among other things, led to the re-election of the Director Defendants to the Board, thereby enabling them to continue breaching their fiduciary duties to the Company.

181.   Additionally, each of the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

182.   Further, the Director Defendants authorized the harmful share repurchase program and caused the Company to repurchase its own common stock at artificially inflated prices, thereby causing the Company to overpay for its own stock. As such, the Director Defendants face a substantial likelihood of liability therefor and are incapable of independently considering a demand in the best interests of the Company.

183.   Defendants Pizarro, Taylor, Chang, Stuntz, Morris, Camuñez, O'Toole, Trent, Beliveau-Dunn, Smith, and Reed, served as directors of the Company during at least a substantial part of the wrongdoing alleged herein, and each faces a substantial likelihood of liability for their participation in the illicit acts alleged herein. The actions these defendants repeatedly and continuously caused or allowed to occur, particularly with respect to (among other things) safety and maintenance of Edison's power lines and related equipment as well as de-energizing power lines during red

- 54 -

flag warnings of high winds (as set forth herein), were an integral aspect of the Company's core operations. It was these very actions, caused or allowed by Defendants Pizarro, Taylor, Chang, Stuntz, Morris, Camuñez, O'Toole, Trent, Beliveau-Dunn, Smith, and Reed, which caused the Company to suffer severe harm (financial, reputational, and other), as set forth herein. This was in violation of (among other things) these defendants' fiduciary duties, as well as the Company's Corporate Governance Guidelines and Ethics and Compliance Code for Directors. Defendants Pizarro, Taylor, Chang, Stuntz, Morris, Camuñez, O'Toole, Trent, Beliveau-Dunn, Smith, and Reed's unexcused pattern of inattention to their fiduciary duties to ensure the Company was acting appropriately to maintain its infrastructure, such as leaving them perennially under-maintained, exposed Edison, its customers, and others in the community to increased risk. Thus, defendants Pizarro, Taylor, Chang, Stuntz, Morris, Camuñez, O'Toole, Trent, Beliveau-Dunn Smith, and Reed (the entire Board) each faces a substantial likelihood of liability for their acts in connection with these actions and statements, rendering a demand upon them futile.

184. Significantly, Edison's perpetual history of disregard for the safety and property of its customers, the repeated attempts to slow or halt remediation of overloaded and dilapidated poles, repeated failures to implement adequate safety measures, and the resulting numerous catastrophic incidents (as described herein), demonstrates constructive knowledge by the Board of these issues. In this case, the Board was made specifically aware by the CPUC (and other entities) of the Company's actions with respect to (among other things) the devastating fires discussed herein and the well-known inability of Edison poles to withstand strong winds, in violation of regulations, and an utter failure to de-energize power lines during a "Particularly Dangerous Situation." The Board's decision to continue to not follow proper safety and maintenance procedures and requirements (as set forth

herein), and instead knowingly cause Edison to violate these requirements, and to hamstring efforts to impose and enforce new safety measures as an intentional business strategy, cannot be regarded as a valid and sound exercise of business judgment.

185. Moreover, this action does not arise from an anomalous incident of misconduct within the Company or from the acts of a "rogue employee" within the Company. Rather, as alleged herein, serious safety violations have occurred systematically and at every level of the Company as a direct result of the Board's decision to embrace a policy of calculated safety and maintenance violations as the Company's deliberate business strategy. There is no legitimate "business judgment" involved in devising or carrying out such an illicit policy. Rather, the Board's actions demonstrate that its members engaged in an unexcused pattern of inattention and inaction, which amounts to an abdication of their duty to the corporation.

186. Furthermore, according to the Company's 2025 Proxy Statement, Defendants Pizarro, Reed, Stuntz, Taylor, and Trent each have experience in the "Utility Industry," and all of the Director Defendants have experience in "Safety." Despite this, the Director Defendants each failed to follow proper safety and maintenance procedures and requirements and caused the Company to engage in unsafe conduct which led to the wildfires, as alleged herein. Accordingly, because of their relevant expertise and experience, the Director Defendants' misconduct and abdication of their fiduciary duties is apparent.

187. Further, the Company is a public utility that provides electricity to customers in a known fire prone area, Southern California. The long history of wildfires in Southern California combined with CPUC's Fire Threat Map puts the Board on notice that severe weather events are a clear and major area of risk for Edison. The recurring wildfire incidents connected to the Company display that the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Board has repeatedly failed to mitigate a risk that materially threatens Edison. Accordingly, demand on the Board is futile and excused.

188.   Despite having knowledge of the history of their own misconduct and mismanagement, the Director Defendants have failed to seek recovery for Edison for any of the misconduct alleged herein.

**THE DIRECTOR DEFENDANTS ARE**

**NOT INDEPENDENT OR DISINTERESTED**

**Defendant Pizarro**

189.   Defendant Pizarro is neither disinterested nor independent, and therefore, is incapable of considering demand because he (as its Co-CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.  As such, Defendant Pizarro cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

190.   As CEO, Defendant Pizarro also fails the stock exchange's bright-line independence test and cannot, therefore, be considered independent. As such, Defendant Pizarro could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Pizarro is therefore futile.

191.   As a trusted Company director, Defendant Pizarro conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

192.   As the Company's highest officer and influential member of the Board, Defendant Pizarro was ultimately responsible for the issuance of all of the false and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

misleading statements.

193.   Because of Defendant Pizarro's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Pizarro is unable to comply with his fiduciary duties and prosecute this action.  Defendant Pizarro is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in a Securities Class Action, brought under the Securities Exchange Act of 1934.

194.   Moreover, Defendant Pizarro signed and therefore personally made the false and misleading statements contained in the Company's SEC filings and faces a substantial likelihood of liability therefor.

195.   Defendant Pizarro is neither independent nor disinterested. Any demand upon Defendant Pizarro is futile and, thus, excused.

**Defendant Taylor**

196.   As alleged herein, Defendant Taylor engaged in unlawful insider trading which garnered lucrative gross proceeds. As such, Defendant Taylor is incapable of independently and impartially considering a demand because not only does he face a substantial likelihood of liability for his unlawful insider trading, but evidently received a material personal benefit therefrom.

**Defendants Beliveau-Dunn, O' Toole, Smith, Reed, Stuntz, Taylor, and Trent**

197.   Defendants Beliveau-Dunn, O' Toole, Smith, Reed, Stuntz, Taylor, and Trent served as members of the Safety and Operations Committee. As alleged herein, the Safety and Operations Committee was responsible for, *inter alia*, overseeing and evaluating the effectiveness of the Company's safety programs, wildfire performance metrics, and risk mitigation strategies.

198.   Defendants Beliveau-Dunn, O' Toole, Smith, Reed, Stuntz, Taylor, and Trent violated the Safety and Operations Committee Charter and breached their

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

fiduciary duties of due care, loyalty, and good faith by failing to adequately review the status of the Company's safety performance, review and provide input regarding safety issues, assist the Board with oversight of risk management and security processes, review the annual strategy and resources of the Company's safety organization, review the Company's safety policies, systems, and benchmarks against industry standards, review processes designed to mitigate key safety risks, review methods used to communicate the Company's core safety values, review safety audit results, findings, and action plans, and make periodic visits to the Company's facilities and discussing safety issues related to those facilities.

**Defendants Morris, Camunez, O'Toole, Reed, Trent**

199. Defendants Morris, Camunez, O'Toole, Reed, and Trent served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, overseeing risk management and otherwise meeting their responsibilities as set forth in the Audit Committee Charter as set forth herein

200. Defendants Morris, Camunez, O'Toole, Reed, and Trent breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting and business reporting issues and deficiencies described above. Therefore, Defendants Morris, Camunez, O'Toole, Reed, and Trent face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Additional Reasons Demand is Futile**

201. Each of the Director Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval

- 59 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

of the unnecessary and harmful repurchases that caused the Company to overpay for its own common stock during the Relevant Period. The Director Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

202.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

203.    Edison has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Current Directors have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Edison any part of the damages Edison suffered and will continue to suffer thereby. Thus, any demand upon the Current Directors would be futile.

204.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

205.    The acts complained of herein constitute violations of fiduciary duties owed by Edison's officers and directors, and these acts are incapable of ratification.

206.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Edison. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Current Directors were to sue themselves or certain of the officers of Edison, there would be no directors' and officers' insurance protection. Accordingly, the Current Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Current Directors is futile and, therefore, excused.

207.    If there is no directors' and officers' liability insurance, then the Current Directors will not cause Edison to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly,

- 61 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 demand is futile in that event, as well

2    208.   Thus, for all of the reasons set forth above, all of the Director Defendants,

3 and, if not all of them, at least six of the Current Directors, cannot consider a demand

4 with disinterestedness and independence. Consequently, a demand upon the Board is

5 excused as futile.

6 **CLAIMS FOR RELIEF**

7 **FIRST CAUSE OF ACTION**

8 **(Against the Individual Defendants for Breach of Fiduciary Duties)**

9    209.   Plaintiff incorporates by reference and re-allege each and every

10 allegation contained above, as though fully set forth herein.

11    210.   The Individual Defendants owe the Company fiduciary obligations. By

12 reason of their fiduciary relationships, the Individual Defendants owed and owe the

13 Company the highest obligation of good faith, fair dealing, loyalty, and due care.

14    211.   The Individual Defendants violated and breached their fiduciary duties

15 of care, loyalty, reasonable inquiry, and good faith.

16    212.   The Individual Defendants engaged in a sustained and systematic failure

17 to properly exercise their fiduciary duties. Among other things, the Individual

18 Defendants breached their fiduciary duties of loyalty and good faith by making false

19 and/or misleading statements and/or failing to disclose that: (i) Edison's claim that

20 Southern California Edison Company ("SCE") used its PSPS program to "proactively

21 de-energize power lines to mitigate the risk of catastrophic wildfires during extreme

22 weather events", was false; (ii) the Company's faulty infrastructure was a likely cause

23 of the wildfires; (iii) this resulted in heightened fire risk in California and heightened

24 legal exposure to the Company; and (iv) as a result, the Individual Defendants'

25 statements about Edison's business, operations, and prospects, were materially false

26 and misleading and/or lacked a reasonable basis at all times. These actions could not

27

28
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

213.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

214.   As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### (Against the Individual Defendants for Gross Mismanagement)

215.  Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

216.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

217.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

218.   Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**THIRD CAUSE OF ACTION**

**(Against the Individual Defendants for Waste of Corporate Assets)**

219.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

220.  The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going.  It resulted in continuous, connected, and ongoing harm to the Company.

221.  As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

222.  As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

**FOURTH CAUSE OF ACTION**

**(Against the Individual Defendants for Unjust Enrichment)**

223.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

224.  By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company

225.  The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

226.   Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## FIFTH CAUSE OF ACTION

### (Against the Individual Defendants for Aiding and Abetting)

227.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

228.   The Director Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Officer Defendants. Likewise, the Officer Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Director Defendants.

229.   Specifically, the Director Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Company to, *inter alia*, not maintain its T&D components, not apply adequate safety protocols, and engage in the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Officer Defendants' violations of law as alleged herein, and failing to report the same.

230.   The Officer Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Officer Defendants' lack of oversight and scheme to issue materially false and misleading statements to the Company's shareholders to secure, *inter alia*, the re-election of certain Director Defendants, by

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

facilitating and disguising the Director Defendants' violations of law as alleged herein, and failing to report the same.

231.   As a result, the Director Defendants substantially assisted the Officer Defendants, and the Officer Defendants substantially assisted the Director Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein.

232.   As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

233.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

### SIXTH CAUSE OF ACTION

### (Against Defendant Taylor for Insider Trading)

234.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

235.   By reason of their fiduciary role as a director of the Company, Defendant Taylor specifically owed the Company the highest obligation of due care, good faith, and loyalty.

236.   As a director of the Company, Defendant Taylor was given access to material information about the Company, as described above, which was not generally available to the public.

237.   When Defendant Taylor sold his Company stock, as detailed *supra*, he was in possession of material, non-public information described above and sold Company stock on the basis of such information for significant gross proceeds.

238.   The information described above was proprietary, non-public information concerning the Company's business operations.  It was a proprietary asset

- 66 -

belonging to the Company, which Defendant Taylor misappropriated to his own benefit when he sold holdings in Company stock. Defendant Taylor knew that this information was not intended to be available to the public. Had such information been generally available to the public, it would have significantly reduced the market price of Company stock.

239. As the use of the Company's proprietary information for his own gain constitutes a breach of Defendant Taylor's fiduciary duties, the Company is entitled to disgorge any illegal profits obtained thereby.

### SEVENTH CAUSE OF ACTION

### (Against the Individual Defendants for Violations of § 10(b) of the Exchange Act)

240. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

241. The Individual Defendants disseminated and/or approved public statements that failed to disclose the above-referenced truthful facts and, as a result of the foregoing, the Individual Defendants' public statements were materially false and misleading at all relevant times. Thus, the price of the Company's shares was artificially inflated due to the deception of the Individual Defendants. Despite this artificial inflation in the price of the Company's shares, the Individual Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing significant financial harm to the Company.

242. As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Edison, their control over, and/or receipt and/or modification of Edison's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Edison, participated in the fraudulent scheme alleged herein.

243.   The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

244.   The Individual Defendants were each members of Edison's Board of Directors and senior management team during the aforesaid time period.  Based on their roles at Edison, each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

245.   At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems at Edison, the Individual Defendants knew and/or recklessly disregarded the extent and scope of their statements.

246. Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the

- 68 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company and its business, operations, financial statements, and financial condition, as alleged herein. The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

247. As such the Individual Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; and (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

248. As a result of the wrongful conduct as alleged herein, the Individual Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and are thus liable for any harm caused to the Company.

## EIGHTH CAUSE OF ACTION

## (Against the Director Defendants for Violations of § 14(a) of the Exchange Act)

249. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

250. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent

or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

251.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

252.    The Director Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

253.    The Director Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2021, 2022, 2023, and 2024 Proxy Statements filed with the SEC.

254.    The Proxy Statements were used to solicit shareholder votes in connection with the re-election of the Director Defendants to the Board, among other things.

255.    The 2024 Proxy Statement was materially false and misleading because the above-referenced statements failed to disclose that: (i) Edison's claim that Southern California Edison Company ("SCE") used its PSPS program to "proactively de-energize power lines to mitigate the risk of catastrophic wildfires during extreme weather events", was false; (ii) the Company's faulty infrastructure was a likely cause of the wildfires; (iii) this resulted in heightened fire risk in California and heightened legal exposure to the Company; and (iv) as a result, the Individual Defendants' statements about Edison's business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all times, which was known, or should have been known to the Director Defendants in the exercise of prudent

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

business judgment. As such, the foregoing statements in the Proxy Statements were half-truths, meaning that the Director Defendants were required to (yet failed to) include all additional information necessary to make the statement not misleading. *See* 17 C.F.R. § 240.12b-20.

256.    Further, the Proxy Statements were false and misleading because, contrary to the assertions contained therein, the Company did not "utilize[] preemptive Public Safety Power Shutoff ("PSPS") de-energization for certain segments of circuits during high wind events to reduce the risk of an ignition becoming a catastrophic wildfire event." Nor did the Company's Safety and Operations Committee fulfil its duties relating to wildfire prevention and mitigation, nor did the Company "make meaningful progress on its wildfire risk mitigation strategy, achieving important milestones related to covered conductor deployment and other system hardening activities."

257.    In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading.

258.    The materially false and misleading statements contained in the Proxy Statements misleadingly induced shareholders to vote in favor of the election of the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

259.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxy Statements.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

B.      Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, aiding and abetting, and violations of Section 10(b) of the Exchange Act;

C.      Awarding, against all the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of the Director Defendants' violations of Section 14(a) of the Exchange Act;

D.      Awarding, against Defendant Taylor and in favor of the Company, disgorgement of all illicitly gained proceeds in connection with his unlawful insider trading;

E.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

F.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 15, 2025                    **WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By: */s/ Alex J. Tramontano*
ALEX J. TRAMONTANO

- 72 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Betsy C. Manifold (182450)
Rachele R. Byrd (190634)
Alex J. Tramontano (276666)
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
Email: manifold@whafh.com
Email: byrd@whafh.com
Email: tramontano@whafh.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
260 Madison Avenue, 22nd Floor
New York, NY 10016
Tel.: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff***

- 73 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**VERIFICATION**

I, CHARLOTTE BARK, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Edison International and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do no have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Edison International common stock at all relevant times.

_Charlotte Bark_
CHARLOTTE BARK